**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **CYNTHIA L. ROGERS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **CIVIL ACTION NO. 5:10-CV-499(MTT)** |
| | ) |
| **GEORGIA DEPARTMENT OF** | ) |
| **CORRECTIONS,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

<u>**ORDER**</u>

This matter is before the Court on Defendant Georgia Department of Corrections'

Motion for Summary Judgment.  (Doc. 25).  Plaintiff Cynthia Rogers alleges that she

was discriminated against based on her race and gender and retaliated against in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  The

Defendant argues that the Plaintiff cannot establish a prima facie case for any of her

claims.  Further, even if the Plaintiff could establish a prima facie case, the Defendant

argues that its employment decisions were based on legitimate, non-discriminatory and

non-retaliatory business reasons.  Finally, the Defendant argues that the Plaintiff cannot

show that those reasons were a pretext for discrimination.  For the following reasons,

the Motion is **GRANTED**.  (Doc. 25).

**I.  FACTUAL BACKGROUND**

Plaintiff Cynthia Rogers is an African-American female.  She worked for the

Georgia Department of Corrections at Wilcox State Prison from 1999 to December 3,

2008 as a correctional officer.  (Doc. 25-1 at 1-2).  In 2008, the Plaintiff was assigned to work in the prison's warehouse where she worked a "split shift" schedule.[1]  (Doc. 25-1 at 5).  The Plaintiff worked with Stephanie Frederick, a civilian employee, in the prison warehouse.

Both the Plaintiff and Frederick lived in Cordele, Georgia, about forty-five minutes from the prison.  They regularly, but not always, commuted together to Wilcox State Prison for about six years.  (Doc. 25-1 at 5).  They were commuting together in 2008, while they were working in the prison's warehouse.  The Plaintiff and Frederick sometimes saw one another on weekends, and were, generally, friends.   (Doc. 25-1 at 5-6).

In July 2008, Frederick's husband informed Wilcox State Prison officials that Frederick was having a personal relationship with an inmate who worked in the prison warehouse.   (Doc. 25-6 at 19:1-7).  After being questioned by prison officials, Frederick admitted to an inappropriate relationship with Inmate Steven Tyler, who worked in the warehouse with both Frederick and the Plaintiff.  Frederick resigned on July 16, 2008.  (Doc. 25-1 at 7).  Prison officials questioned the Plaintiff about Frederick's and Inmate Tyler's relationship, but she denied any knowledge of the relationship.  (Doc. 25-1 at 7-8).  The Plaintiff also gave a written statement, dated July 25, 2008, denying knowledge of the inappropriate relationship.   (Doc. 25-1 at 8; Doc. 25-9 at 2).

Kimberly Walker replaced Frederick as the property supply supervisor in the prison warehouse.  Inmate Wendell Bass told Walker and Doris Evans that the Plaintiff

---

[1] The Plaintiff's assignment to the split shift meant that she worked Monday through Friday, while having the weekends and state holidays off.  (Doc. 25-10 at 28:6-10).

and Frederick had showed him how to access the computer and allowed him to use the computer.  (Doc. 25-1 at 8; Doc. 25-6 at 20:6-12).   At his deposition, Inmate Bass testified that Frederick taught him how to use the computer, but that the Plaintiff was aware Frederick had given him the password and was present while he used the computer, a violation of prison rules.  (Doc. 25-5 at 17:15-22).  He further testified that if he did not use Frederick's password, he would use the Plaintiff's password.  (Doc. 25-5 at 17:15-22).  Inmate Bass also testified that, while the Plaintiff was present, he saw Inmate Tyler and Frederick touching each other's neck and shoulders and Frederick bringing food to Inmate Tyler.  (Doc. 25-5 at 22-23).  Finally, Walker claimed that data had been deleted from Frederick's computer after Frederick has resigned, further suggesting the Plaintiff's knowledge of potential wrongdoing.  (Doc. 25-1 at 9-10).

On July 21, 2008, the Plaintiff was assigned to a different position—an educational officer—while the investigation into Frederick's and the Plaintiff's possible prison policy violations was ongoing.  (Doc. 25-1 at 10-11).  This reassignment did not change the Plaintiff's pay, hours or supervisors.  (Doc. 25-10 at 75).  Eventually, because of (1) Frederick's and the Plaintiff's close relationship, (2) Inmate Bass' allegations regarding his computer use, and (3) Walker's concern that computer data had been deleted after Frederick's departure, Wilcox State Prison Warden Donald Barrow requested an Internal Affairs investigation into the Plaintiff's potential misconduct.  (Doc. 25-1 at 10-11;Doc. 25-4 at ¶ 14).  Once the Internal Affairs investigation was requested, Wilcox State Prison administrators were no longer involved in investigating the Plaintiff.  (Doc. 25-1 at 11).

In November 2008, the Plaintiff was moved from "split shift" to "regular shift." (Doc. 25-1 at 11).  On the regular shift, employees worked six days on and three days off.  (Doc. 25-10 at 30).  Warden Barrow testified that, to his recollection, the change in shift was based on staffing needs at the time and that employees' shift assignments would regularly change depending on staffing needs.  (Doc. 25-4 at ¶¶ 16, 17).  Shortly after this shift change, the Plaintiff told Julie Harnage, a human resources employee at the Department of Corrections headquarters, that she felt the change to the regular shift was the result of retaliation and discrimination.

On November 24, 2008, Internal Affairs investigator William King interviewed the Plaintiff.   The Plaintiff again denied knowledge of Frederick's misconduct and denied letting inmates use computers.  King then interviewed Kimberly Walker and Inmate Wendell Bass.  Both told King that the Plaintiff, and Frederick, allowed Inmate Bass to use a prison computer.  (Doc. 25-1 at 12-13).  Further, Inmate Bass, who was scheduled to be released, told King that the Plaintiff asked him for his post-release personal contact information.  He also testified that another inmate, Michael Paris, had told him the Plaintiff asked other inmates for Inmate Bass' contact information.  (Doc. 25-1 at 13).  King also interviewed Inmate Paris, and eventually Inmate Geoffrey Cochran.  Both of the inmates told King that the Plaintiff attempted to get Inmate Bass' post-detention contact information.

King interviewed the Plaintiff again on December 3, 2008.  (Doc. 25-1 at 13).  The Plaintiff admitted asking about Bass but denied asking for his contact information.  (Doc. 25-1 at 13-14).  During the meeting, the Plaintiff agreed that asking for Inmate Bass's contact information would have been a violation of the prison's prohibition on

personal dealing with inmates.  Though King did not have the authority to terminate or

recommend termination of a prison employee, the Plaintiff alleges King told her that she

would be terminated if she did not resign.  (Doc. 25-1 at 14).  The Plaintiff also testified

that she resigned because she "feared that [her] work history would be gone if [she] did

not resign" and that she did not "want a termination on [her] employment history."  (Doc.

25-10 at 152).   That day, the Plaintiff signed in the presence of Wilcox State Prison

Deputy Warden Willie Hollie, a resignation letter presented to her.  The letter read:

> I hereby resign my employment with the Georgia Department of
> Correction in lieu of cooperating with an internal investigation.  I
> understand that my resignation is made freely without coercion or
> promise and that it is not an admission of guilt on my part of any
> alleged wrong doing.

(Doc. 25-1 at 14-15).

As a law enforcement officer, the Plaintiff was certified by the Georgia Peace

Officers Standards and Training Council (POST).  At some point after her resignation,

the Department of Corrections sent notice of the resignation to POST.  According to

Warden Barrow, POST was notified of the Plaintiff's resignation "because POST's rules

require employers to notify POST when a POST-certified law enforcement officer is

disciplined or resigns under such circumstances."  (Doc. 25-4 at ¶ 21).

The Plaintiff submitted an intake questionnaire to the Equal Employment

Opportunity Commission (EEOC) on April 14, 2009.  (Doc. 25-1 at 17).  On the intake

questionnaire, the Plaintiff checked "color" as the basis for her claim of employment

discrimination.   (Doc. 24-7 at 2).  She also wrote that the discriminatory conduct was

(1) her October 29, 2008 transfer to the regular shift, and (2) her December 13, 2008

forced resignation.   However, the Plaintiff's Charge of Discrimination was not filed until

July 6, 2009.  On this form, the Plaintiff checked "race" and "retaliation" as the basis for her claim.  She alleged the earliest date that the discrimination took place was October 29, 2008, and the latest, was May 18, 2009.  (Doc. 27-5 at 1).  With regard to specific discriminatory conduct, along with the conduct mentioned in her Intake Questionnaire, the Plaintiff alleged that a negative reference was given to a prospective employer.  She further wrote "I was placed on regular shift and forced to resign because I was accused of being aware of a co-worker's relationship with an inmate."  (Doc. 27-5 at 1).  And, although she did not check the corresponding box, the Plaintiff wrote she was discriminated against because of her sex.  The Plaintiff received her Notice of Right to Sue on September 25, 2010 (Doc. 27-3 at 2) and brought this suit on December 22, 2010 (Doc. 1).

## II. SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing…relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party does not satisfy his burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact."  *Id.*  (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III.  DISCUSSION

#### A. *McDonnell Douglas* Framework

The Plaintiff relies on circumstantial evidence and the framework for analyzing circumstantial evidence first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish a prima facie case of discrimination.  Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly for each of the Plaintiff's claims.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

The burden then returns to the plaintiff to prove that the employer's reasons are a pretext for discrimination.  *Id.* at 253.  The employee can meet this burden "either

directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (emphasis added).  If the proffered reason is one that might have motivated a reasonable employer, the employee "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000).  If a defendant articulates more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive summary judgment.  *Id.* at 1037.  Thus, "[a] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. B.P. Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994).

### B.    The Deficiencies in the EEOC Charge of Discrimination

The Defendant claims that some of the Plaintiff's claims should be dismissed because the Plaintiff failed to properly exhaust her administrative remedies.  "Before instituting a Title VII action in federal district court, a private plaintiff must file an EEOC complaint against the discriminating party and receive statutory notice from the EEOC of his or her right to sue the respondent named in the charge."  *Forehead v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996).  The administrative charge must be filed within 180 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e)(1).  In addition to filing a timely EEOC charge, a plaintiff who wishes to bring a lawsuit in federal court must do so within ninety days of receiving her right-to-sue notice from the EEOC.  42 U.S.C. § 2000e-5(f)(1).

The Defendant claims that the Plaintiff failed to exhaust her administrative remedies for her gender discrimination claim because she failed to check "sex" as a basis for discrimination in her Charge of Discrimination.  (Doc. 25-2 at 4).  "Courts are … 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII], ….'"  *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Sanchez c. Standard Brands, Inc.*, 431 F.2d 455, 460-61 (5th Cir. 1970)).  "[T]he proper inquiry" is whether the "complaint was like or related to, or grew out of, the allegations contained in [the] EEOC charge."  *Id.*   Therefore, the Court must examine whether the Title VII claims alleged in the Plaintiff's complaint could "reasonably be expected to grow out of" the Charge of Discrimination.  *Id.*  (internal quotations and citation omitted).

Here, the Plaintiff only checked "race" and "retaliation" as the bases for her employment discrimination claim.  However, she alleged in a separate portion of the Charge that she was discriminated against because of her sex in violation of Title VII.  (Doc. 27-5 at 1).   Thus, a Title VII gender discrimination claim could reasonably be expected to grow out of the Charge of Discrimination.  Therefore, the Plaintiff's Title VII gender discrimination claim was properly exhausted.

The Defendant next alleges that claims for two of the adverse employment actions alleged in the Complaint are time-barred.  The Plaintiff alleges in her Complaint four adverse employment actions: (1) her reassignment to the education department, (2) her reassignment to the regular shift, (3) the initiation of an internal investigation into the Plaintiff's potential prison policy violations, and (4) her resignation.  (Doc. 1).  In her Title VII retaliation claim, the Plaintiff alleges those four employment actions, plus the

POST notification, were retaliatory.  (Doc. 1).  The Defendant argues that two of the alleged acts of discrimination—the Plaintiff's reassignment as an educational officer and Wilcox State Prison's request for an internal investigation—were "discrete acts and are barred because [the] Plaintiff did not raise them before the EEOC in a timely manner." (Doc. 25-2 at 4-5).

If a plaintiff does not file an EEOC charge within the 180-day limitations period, a subsequent lawsuit is time barred.  In cases involving discrete retaliatory or discriminatory acts, each act occurs on the day that it happens.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002).  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."  *Id.* at 114 (internal quotations and citation omitted).  Consequently, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 102.  Moreover, the limitations period begins to run when an employee received notice of the allegedly discriminatory act, not when the consequences of the decision become painful to the employee. *See e.g., Delaware State College v. Ricks*, 449 U.S. 250 (1980).

Here, the Plaintiff was moved to the education department and Warden Barrow requested an Internal Affairs investigation in July 2008.  (Doc. 25-4 at ¶¶ 14-15).  The Plaintiff submitted her EEOC Intake Questionnaire in April 2009 and her Charge of Discrimination in July 2009.   Thus, the Defendant claims that those two alleged discriminatory acts were not properly exhausted because the Plaintiff did not file an EEOC charge for those acts within the 180-day limitations period.  The Court agrees. Both are discrete acts of discrimination and, as such, they are time-barred because the

Plaintiff did not file a charge of discrimination, or even an intake questionnaire, within the 180-day limitations period.  Therefore, the Court finds the Defendant's decision to move the Plaintiff to the educational department and to request an Internal Affairs investigation are time-barred and should not be considered as a basis for the Plaintiff's Title VII race and gender discrimination claims.

### C.    Title VII Gender and Race Discrimination Claim

The Defendant contends that the Plaintiff cannot establish a prima facie case for her race and gender discrimination claims.  To establish a prima facie case of disparate treatment based on gender or race, a plaintiff must show (1) she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated people outside of the protected class more favorably; and (4) she was qualified to do the job.  *McCann v. Tillman,* 526 F.3d 1370, 1373 (11th Cir. 2008) (internal citations and quotations omitted).  If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Id.*  If it does, then the plaintiff must show the reason proffered by the defendant is a pretext for unlawful discrimination.  *Id.*

Here, there is no dispute that the Plaintiff satisfies the first and fourth prongs of a prima facie case for both her race and gender discrimination claims.  The Defendant denies the Plaintiff has established she suffered an adverse employment action and that a similarly situated non-protected employee was treated more favorable.

### 1.  Adverse Employment Action

"To prove an adverse employment action … an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover,

the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).  "[N]ot all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Id.* at 1238.  And while an adverse employment action need not result in a decrease in pay, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 1239.

Here, none of the Defendant's actions, other than *potentially* the Plaintiff's resignation, are adverse employment action.  As stated above, neither the Plaintiff's move from the warehouse to the education department nor the request by Warden Barrow for an internal investigation was properly exhausted.  However, even if they had been properly exhausted, neither is an adverse employment action.  First, the Plaintiff's reassignment to the educational department did not have a tangible adverse effect on her employment.  Her pay, supervisors and hours remained the same.  A transfer will generally only constitute an adverse employment action "if it involves a reduction in pay, prestige or responsibility." *Hinson v. Clinch County Bd. of Education*, 231 F.3d 821, 829 (11th Cir. 2000).  Second, Warden Barrow's request that the Internal Affairs division further investigate any potential wrongdoing by the Plaintiff was not a material change in the terms, conditions or privileges or her employment.  As the Defendant argues, the Eleventh Circuit has held that initiation of an internal investigation against an employee does not constitute an adverse employment action. *Rademakers v. Scott*, 350 Fed.

App'x 408, 412-13 (11th Cir. 2009)[2] (citing *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 60 (2006)).[3]

The Plaintiff's reassignment to the regular shift fails for the same reasons her reassignment to the education department fails.  Though the Plaintiff alleges that the regular shift is not as prestigious or convenient as the split shift, "'the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.'"  *Butler v. Alabama Dep't of Transportation*, 536 F.3d 1209, 1215 (11th Cir. 2008) (quoting *Davis*, 245 F.3d at 1239-40).   "[A]n employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm will [generally] be outside the protection afforded by Congress in Title VII's anti-discrimination clause…."  *Davis*, 245 F.3d at 1245.[4] Therefore, the Plaintiff's reassignment to the regular shift does not constitute an adverse employment action.

Finally, the Defendant argues that the Plaintiff's decision to resign in lieu of cooperating with the investigation was voluntary and not an adverse employment action.

---

[2] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

[3] In *Rademakers*, the Eleventh Circuit held that being the subject of an internal investigation was not a "materially adverse action." This holding was in the context of an employee's retaliation claim.  The burden of proving an adverse employment action for purposes of a retaliation claim is much lower than proving an adverse employment action in a race or gender discrimination claim.  This further bolsters the Defendant's contention that an internal investigation is not an adverse employment action for purposes of the Plaintiff's race and gender claims.

[4] The standard for evaluating adverse employment actions under *Davis* remains good law with regard to Title VII discrimination claims.  As the Court will explain, *supra* III.B.1, the standard has been revised with regard to adverse actions under Title VII's anti-retaliation provisions.  *See e.g. Crawford v. Carroll*, 529 F.3d 961, 971-72 (11th Cir. 2008).

The Plaintiff alleges that King told her that she would be terminated if she did not resign, and that she felt she had no choice but to resign.  (Doc. 25-1 at 14).  The Plaintiff also testified that she resigned because she "feared that [her] work history would be gone if [she] did not resign" and that she did not "want a termination on [her] employment history."  (Doc. 25-10 at 152).   Moreover, on her Charge of Discrimination, the Plaintiff alleged she was forced to resign because she was accused of being aware of a co-worker's relationship with an inmate, not because of her race or gender.  Further, the Plaintiff signed a "pre-written" resignation letter, which read:

> I hereby resign my employment with the Georgia Department of Correction in lieu of cooperating with an internal investigation.  I understand that my resignation is made freely without coercion or promise and that it is not an admission of guilt on my part of any alleged wrong doing.

(Doc. 25-1 at 14-15).

"A resignation is presumed voluntary unless an employee 'comes forward with sufficient evidence to establish that the resignation was involuntarily extracted.'" *Rademakers*, 350 Fed. App'x at 411 (quoting *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)).   Further, to show a resignation was involuntary, the Plaintiff must show that it was the result of a circumstance that deprived her of "free will in choosing to resign," such as coercion or duress.  *Id.* (internal quotations and citation omitted).   Whether a resignation was voluntary or involuntary is evaluated pursuant to an objective standard, rather than by an employee's purely subjective beliefs.  *Id.* at 411-12.  Further, as the Defendant argues:

> [T]hat the employee may perceive [her] only option to be resignation – for example, because of concerns about [her] reputation – is irrelevant.  Similarly, the mere fact that the choice is between

comparably unpleasant alternatives -- e.g., resignation or facing
disciplinary charges – does not of itself establish that a resignation
was induced by duress or coercion, hence was involuntary.

*Id.* at 412 (internal quotations and citation omitted).

Here, it is unlikely that the Plaintiff can establish that her voluntary resignation
was, in fact, "involuntarily extracted."  However, the Court notes that the Plaintiff has
alleged some facts, if believed, that suggests there is some measure of coercion.  The
Plaintiff alleges that she was told, by an Internal Investigator, that she had to resign or
she would be terminated.  Further, she alleges she was presented with a pre-written
resignation letter to sign. Therefore, at the summary judgment stage—where all facts
are to be construed in favor of the Plaintiff's case—the Court finds that the Plaintiff has
alleged sufficient facts to suggest that her voluntary resignation could have been the
product of coercion or duress.

### 2. Similarly Situated Employee

If the Plaintiff had suffered an adverse employment action, she would have to
further show that a similarly situated employee from outside her protected class was
treated more favorably than she.   The Plaintiff must show that her comparators are
"similarly situated in all relevant respects."  *Knight v. Baptist Hosp. of Miami*, 330 F.3d
1313, 1316 (11th Cir. 2003).  "Further, employees are 'similarly situated' if they are
involved in the same or similar misconduct but are disciplined in different ways."
*Santillana v. Florida State Court Sys.*, 450 Fed. App'x 840, 843 (11th Cir. 2012) (citing
*Rioux v. City of Atlanta*, 520, F.3d 1269, 1280 (11th Cir. 2008)).  "The quantity and
quality of the comparator's misconduct must be nearly identical to prevent courts from
second-guessing employers' reasonable decisions and confusing apples with oranges."

*Rioux*, 520 F.3d at 1280.  (internal quotations and citation omitted).  "Misconduct merely similar to the misconduct of the disciplined plaintiff is insufficient."  *Id.*  (internal quotations and citation omitted).

Here, for her Title VII race discrimination claim, the Plaintiff claims that "Ms. Brown,"[5] a white female, is a proper comparator.  For her Title VII race and gender discrimination claims, the Plaintiff claims Bobby Helms, a white male, is a proper comparator.  The Plaintiff asserts that, like her, Brown and Helms worked with co-workers who engaged in inappropriate relationships with prison inmates.  However, according to the Plaintiff, Brown and Helms were not investigated, reassigned, or forced to resign.  (Doc. 1; Doc. 25-10 at 111:2-23, 115:9-23).

Brown and Helms are not sufficiently similar comparators for purposes of the Plaintiff's prima facie case.  Most importantly, there is no evidence, indeed not even an allegation from the Plaintiff, that Brown or Helms might have known about their co-workers' misconduct, and thus should have been the subjects of investigation. Moreover, Warden Barrow testified that the prison administration had no reason to believe that Brown or Helms taught inmates how to use computers or asked for current contact information of former inmates.  On the other hand, there was reason for prison officials to suspect the Plaintiff had knowledge of Frederick's misconduct and had improperly attempted to contact a former inmate.  In short, the reason Helms and Brown were not investigated is that there was no reason to believe they did anything wrong.

---

[5] The Plaintiff testified she did not know Ms. Brown's first name.

Thus, they are not "similarly situated in all relevant respects."  Therefore, the Plaintiff's cannot establish a prima facie case.

### 3.  The Defendant's Legitimate Non-Discriminatory Reasons

Assuming the Plaintiff could establish a prima facie case for Title VII race and/or gender discrimination, the Defendant gives several legitimate non-discriminatory reasons for their employment decisions.

The Defendant articulates several reasons for its employment decisions relating to the Plaintiff.  First, for the reasons discussed above, the Defendant contends the prison administration had reason to believe that the Plaintiff had knowledge of Frederick's inappropriate relationship with Inmate Tyler, and thus an investigation was appropriate.   Because the prison's preliminary investigation found some support for this belief, it then became appropriate to request an Internal Affairs investigation.  To protect the integrity of that investigation, it was necessary to move the Plaintiff from the warehouse to the educational department.  The Plaintiff was moved to the regular shift because of staffing, and that move had nothing to do with the prison administration's suspicions or the investigations.

The Plaintiff has failed to show any of these reasons are a pretext for discrimination.  In fact, the Plaintiff barely quarrels with the underlying facts.  Instead, the Plaintiff argues that she did not know about Frederick's and Inmate Tyler's relationship, that she did not give her password to Inmate Bass, and that she only asked about former Inmate Bass, but did not ask for contact information.  In short, she claims she was innocent of the wrongdoing.  That may or not may not be, but the Plaintiff

misses the point.  The Defendant has given reasons for its decisions to investigate the

Plaintiff and to reassign the Plaintiff.  The Plaintiff has not rebutted those reasons.

Thus, the Plaintiff has simply not produced evidence "sufficient to permit a reasonable

fact-finder to conclude that the reasons given by the employer were not the real reasons

for the adverse employment decisions."[6]  *Combs*, 106 F.3d at 1528.  Therefore, the

Defendant is entitled to summary judgment on the Plaintiff's Title VII race and gender

discrimination claims.

### D.   Title VII Retaliation Claim

An employer may not retaliate against an employee because the employee "has

opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

The *McDonnell Douglas* burden shifting framework is used in Title VII retaliation claim

analysis.  To establish a prima face case of retaliation, a plaintiff must show that (1) she

engaged in statutorily protected expression; (2) she suffered an adverse employment

action; and (3) the adverse action was causally related to the protected expression.

*Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006).

If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer

to articulate legitimate reasons for the adverse employment action, and, if the employer

does so, a plaintiff has the ultimate burden of showing by a preponderance of the

---

[6] Again, the Court notes, most of these employer actions are not actually adverse employment
decisions.  However, for the purpose of the *McDonnell Douglas* analysis, the Court presumes
the Plaintiff has met this burden.

evidence that the employer's reasons were pretextual.  *Holifield v. Reno*, 115 F.3d 1555, 1564-66 (11th Cir. 1997).

An employee's speech regarding unfair employment practices is statutorily protected speech if the employment practice is made unlawful by Title VII.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999).   Here, the Plaintiff alleges that she engaged in statutorily protected expression twice: (1) in November 2008 when she informed Julie Harnage at the Department of Corrections' headquarters that she thought that her assignment to the regular shift was discriminatory and retaliatory, and (2) in April and July 2009 when she contacted the EEOC.  For purposes of this Motion, the Defendant concedes that these two "expressions" are statutorily protected and thus, satisfy the first prong of a prima facie case of Title VII retaliation.  (Doc. 25-2 at 17). However, the Defendant argues that neither of these expressions is causally connected to an adverse employment action; therefore, the Defendant argues the Plaintiff cannot establish the second and third prongs of a prima facie case of retaliation.

## 1. Adverse Employment Action

The standard for an adverse employment action in a Title VII retaliation prima facie case is slightly less rigorous than the traditional adverse employment action analysis for Title VII discrimination claims.  To establish an adverse action in the context of a retaliation claim, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White*, 548 U.S. at 68 (internal quotations and citations omitted).  In *White*, the Supreme Court emphasized "*material* adversity because … it is important to

separate significant from trivial harms.  Title VII … does not set forth 'a general civility code for the American workplace.'"  *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)) (emphasis in original).

In addition to the adverse employment actions discussed above, the Plaintiff claims that Wilcox State Prison's notification to POST constituted retaliation.  The Defendant concedes given the relaxed adverse employment action standard in retaliation cases, that (1) the Plaintiff's transfer from the warehouse to the educational department, (2) the Plaintiff's transfer from the split shift to the regular shift, and (3) the prison's notification to POST regarding the Plaintiff's resignation, could arguably constitute adverse employment actions.  (Doc. 25-2 at 18).  However, the Defendant argues that the internal investigation of the Plaintiff and her voluntary resignation do not constitute adverse employment reasons for "the same reasons explained above in regard to her discriminations claims." (Doc. 25-2 at 18).  The Plaintiff merely argues, without citing authority, that all these actions constitute adverse employment actions. (Doc. 27-1 at 19).  The Court agrees with the Defendant in part, and finds Warden Barrow's request for an internal investigation is not an adverse employment action, even under the relaxed standard, for the same reasons discussed in the Court's analysis of the Plaintiff's Title VII race and gender discrimination claims.[7]  However, as discussed above, the Plaintiff has alleged some facts that, if believed, suggest her resignation was involuntary because some measure of coercion was involved. Therefore, with regard to the Plaintiff's reassignments to the education department and to the regular shift, her resignation, and the POST notification, the Plaintiff has

---

[7] *See infra* III.A.1.

established the second prong—adverse employment actions—of her prima facie case for retaliation.

2. <u>Causal Connection Between Protected Speech and Adverse Employment Actions</u>

With regard to those employment actions that constitute adverse employment actions, the Defendant argues that the Plaintiff cannot show a causal connection between her protected expression and the adverse actions.  A causal link can be established by showing that "the protected activity and the adverse action were not wholly unrelated."  *Clover*, 176 F.3d at 1354 (internal quotation marks and citation omitted).  A plaintiff can satisfy this element if she "provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  However, "the temporal relationship between the protected activity and the adverse employment action must be 'very close.'"  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  And while a close temporal proximity may be sufficient to create an issue of fact regarding the causal connection prong, "temporal proximity *alone* is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (emphasis added).

First, Warden Barrow's decisions to reassign the Plaintiff to the education department and move her to the regular shift clearly were not retaliatory because they

took place before the Plaintiff's first alleged protected speech.  The decisions to investigate the Plaintiff and to reassign her to the education department occurred in July 2008, and the decision to move her to the regular shift was made in late October or early November 2008.  The Plaintiff allegedly complained to Julie Harnage *after* she was reassigned to regular shift.  (Doc. 25-10 at 70, 71 and 74).  "A decision maker cannot have been motivated to retaliate by something unknown to him."  *Brungart,* 231 F.3d at 799.  Thus, the Plaintiff cannot establish a causal connection between those two adverse employment actions that took place prior to her protected speech.

There is also no evidence that the Plaintiff's resignation or the Defendant's POST notification of her resignation was causally connected to her protected speech.  First, both the Plaintiff's December 3, 2008 resignation, and the POST notification triggered by her resignation occurred well before April 2009 when the Plaintiff submitted her Intake Questionnaire with the EEOC.   Further, even though both adverse employment actions happened after her alleged November 2008 phone call to Julie Harnage, "temporal proximity *alone* is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  With regard to the Plaintiff's resignation, there is no evidence that those officials involved in her resignation –Warden Barrow, Internal Investigator King, and Deputy Warden Hollie—had any knowledge of her phone call to Julie Harnage.  Thus, even if they were considered decision-makers, they could not have been motivated to retaliate by something unknown to them.  The same is true for the POST notification.  The Plaintiff does not allege that the Department of Corrections' officials who notified POST of her resignation

had knowledge of her phone call to Harnage.  In fact, the Plaintiff's testimony indicates that she knew the prison was required to notify POST upon her resignation.  (Doc. 25-10 at 132:5-20).  Therefore, the Plaintiff's resignation and the Defendant's POST notification of her resignation are not causally related to her protected speech, and the Plaintiff has failed to establish the third prong in her prima facie case of retaliation.

### 3.  The Defendant's Legitimate Non-discriminatory Reasons

Even if the Plaintiff could establish that all the alleged adverse employment actions were causally related to her protected speech, her Title VII retaliation claim fails because the Defendant has articulated several legitimate non-discriminatory reasons for its employment decisions.  As discussed above with regard to the Plaintiff's race and gender claims, the Plaintiff has failed to put forth any evidence that the Defendant's reasons were a pretext for retaliation.[8]  Additionally, the Defendant was required to notify POST of the Plaintiff's resignation.  (Doc. 25-4 at ¶ 21).  The Plaintiff has not shown that this reason was pretextual.  On the contrary, the Plaintiff agrees that the Defendant was required to notify POST upon her resignation.  Therefore, the Defendant is entitled to summary judgment on the Plaintiff's Title VII retaliation claim.

## IV.    CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment is **GRANTED**.  (Doc. 25).

**SO ORDERED**, this 2nd day of November, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[8] *See infra* III.A.3. for the Court's analysis regarding the Defendant's legitimate non-discriminatory reasons for their decisions relating to the Plaintiff's employment, and the Plaintiff's failure to put forth evidence of pretext.